## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KELLY KLEIN,                        :

                :

       **Plaintiff,**           :

                :

**v.**                       :       **CASE NO. 8:21-cv-00476-PX**

                :

**SINCLAIR BROADCASTING GROUP, INC.**  :       **DEMAND FOR JURY TRIAL**

**and RING OF HONOR WRESTLING**     :

**ENTERTAINMENT, LLC,**           :

                :

       **Defendants.**          :

## AMENDED COMPLAINT

COMES NOW Plaintiff Kelly Klein, by and through her attorneys, Julian A. Haffner and the law firm of YK Law, LLP, and Stephen P. New and the law firm of New, Taylor & Associates, and files this Amended Complaint against Defendant SINCLAIR BROADCAST GROUP, INC. and Defendant RING OF HONOR WRESTLING ENTERTAINMENT, LLC for Declaratory Judgment Finding Arbitration Agreement Void or Voidable; Declaratory Judgment Establishing that Plaintiff is an Employee of Defendants; Declaratory Judgment Establishing that the Provisions of the Agreement and Amendment Relating to Klein's Classification as an Independent Contractor are Void as against Public Policy; Declaratory Judgment and Claim for Damages Establishing that Defendants are Jointly And Severally Liable; Declaratory Judgment and Claim for Damages Establishing Royalties Due; Breach of Implied Contract (In the Alternative); Failure to Provide a Safe Place of Employment; Violation of State and Federal Equal Pay Acts; Sexual Harassment (In the Alternative); and, Abusive Discharge (In the Alternative), and in support thereof Plaintiff Kelly Klein based upon actual knowledge with

respect to her own acts and upon knowledge, information and belief with respect to all other matters, alleges as follows:

**<u>Jurisdiction and Venue</u>**

1.      Plaintiff Kelly Klein ("Klein") is an individual who is a resident of the State of Ohio and who, at all times relevant herein, resided in the State of Ohio.

2.      Defendant Sinclair Broadcast Group, Inc. ("Sinclair") is a corporation formed under the laws of the State of Maryland with its principal place of business located at 10706 Beaver Dam Road, Cockeysville, Maryland 21030 in Baltimore County, Maryland.

3.      Defendant Ring of Honor Wrestling Entertainment, LLC ("ROH") is a limited liability company formed under the laws of the State of Maryland with its principal place of business located at 10706 Beaver Dam Road, Suite 201, Cockeysville, Maryland 21030 in Baltimore County, Maryland.

4.      ROH is a subsidiary of Sinclair. Sinclair, as parent company, is so closely related and integrated to ROH, the subsidiary, as to constitute a single integrated enterprise, and thus, they are jointly and severally liable for their wrongful acts.

5.      Jurisdiction is predicated upon 28 U.S.C. § 1332.

6.      Defendants are each subject to this Court's personal jurisdiction because they were formed under the laws of the State of Maryland, have their principle places of business in Maryland, and engaged in acts in Maryland that gave rise to the claims in this action.

7.      The amount in controversy is in excess of $75,000.00, exclusive of interest and costs.

8.      Jurisdiction is also predicated upon 28 U.S.C. § 1331 as Plaintiff claims damages for violation of the Equal Pay Act, 29 U.S.C. § 206(d).

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (2).

**The Parties**

10.     Klein is a professional wrestler who made her debut in 2006. In 2015, Klein made her debut for ROH as part of the company's "Women of Honor" ("WOH"). WOH was the nomenclature used by ROH to describe ROH's female wrestlers.

11.     Klein was ROH's top female wrestler, as evidenced by the Company anointing her the WOH World Champion a record three times and by the Company asking her to make live and recorded news appearances (print, audio, and visual) to promote and represent Defendants' brands.  ROH's website provides the following information about Klein:

> Known as 'The Gatekeeper' and 'Pretty Badass,' Klein has been dominant since her WOH debut in 2015. With an impressive combination of physicality, mat wrestling and submission mastery, Klein has never (at the time of the article) been pinned or forced to submit in WOH. Her aptly named 'End of the Match' guillotine choke is the most feared maneuver in women's wrestling. In 2017, Klein added Deonna Purrazzo, Jenny Rose, Brandi Rhodes and Stella Grey, among others, to her list of victims, and in Japan, she and Bea Priestley won the Goddess of Stardom Tag League tournament.

(*See*,  https://www.rohwrestling.com/news/roh-5-count-top-5-women-honor-competitors, last accessed June 7, 2021.)

12.      Sinclair is a publicly traded American telecommunications conglomerate and is the second-largest television station operation in the United States, owning or operating a total of 193 stations across the country in 100 markets covering 40% of American households and is the largest owner of stations affiliated with Fox, ABC and the CW. Sinclair also owns four digital multicast networks, sports-oriented cable networks, a streaming service and four radio stations. Sinclair also owns the professional wrestling promotion Ring of Honor and its streaming service Honor Club. (*See*, https://en.wikipedia.org/wiki/Sinclair_Broadcast_Group, last accessed

June 7, 2021.) Sinclair has "invested significant time and energy in expanding the scope and reach of Ring of Honor to a global audience" (*See*, https://www.wrestlinginc.com/news/2018/11/roh-coo-joe-koff-comments-on-sinclair-ceo-calling-ring-of-647650/, last accessed June 7, 2021) and ROH was able to sell out Madison Square Garden one year in advance in merely 11 minutes. (*Id.*)

13.     Sinclair's gross revenue for the fiscal year ending December 31, 2017 was $2,636,000,000; for the fiscal year ending December 31, 2018, it was $3,055,000, 000; and, for the fiscal year ending December 31, 2019, it was $4,240,000,000. (*See*, https://www.nasdaq.com/market-activity/stocks/sbgi/financials, last accessed June 7, 2021.)

14.     ROH is a professional wrestling company which produces weekly one-hour wrestling programs broadcast on Sinclair Broadcast Stations, as well as syndicated on select TV stations and regional cable systems. ROH weekly shows are also made available world-wide at rohwrestling.com and on the ROH apps. In addition, ROH performs many live events each year in various cities. (See, https://sbgi.net/ring-of-honor/, last accessed June 7, 2021.)

15.     Greg Gilliand ("Gilliand") is the General Manager of ROH.

16.     Hunter Johnston ("Johnston") is a booker, creative director, senior producer and/or head trainer at the Baltimore dojo training program for ROH.

17.     Joe Koff ("Koff") is the Chief Operating Officer and Vice-President of Training and Development for ROH. Koff has been with Sinclair since 2003 and he became the Chief Operating Officer of ROH in 2011. Since 2010, he has headed Sinclair University, the Company's in-house sales training program he created. Prior to that and from 2006, he was a Group Manager overseeing multiple Sinclair television markets. From 2003 through 2006, Mr. Koff headed Sinclair's in-house direct mail initiative. (*See*, https://www.prnewswire.com/news-

releases/sinclair-names-joseph-koff-vice-president-of-training-and-development-230995651.html, last accessed June 7, 2021.)

18.     Jamar Shipman ("Shipman") is a professional wrestler with ROH who is known in the ring as "Jay Lethal." Shipman signed with ROH in 2011, is one of the most popular wrestlers in the country, and is referred to as "the franchise of Ring of Honor." (*See*, https://www.tampabay.com/arts-entertainment/jay-lethal-set-to-become-first-non-wwe-wrestler-in-nearly-60-years-to-headline-a-show-at-msg-20190329/, last accessed June 7, 2021.) Shipman is a two-time ROH World Champion and holds the record for the longest championship reign in the company's history. Shipman has also wrestled for other wrestling promotions with national and international television clearances and has appeared in movies (e.g. The Wrestler starring Mickey Rourke), television shoes (e.g. celebrity Family Feud), and video games. (*See*, https://en.wikipedia.org/wiki/Jay_Lethal#Other_media, last accessed June 7, 2021.)

## The Agreement and Amendment

19.     On or about December 20, 2017, Klein and ROH executed a document titled "Independent Contractor Agreement" (hereinafter "Agreement"). The Agreement had an effective date of January 1, 2018 and a termination date of December 31, 2018. A true and accurate copy of that Agreement is attached hereto and incorporated herein as Plaintiff's Exhibit A.

20.     Klein and ROH executed a document titled "Amendment 2019" with an effective date of January 1, 2019 ("Amendment"). The Amendment extended the terms of the Agreement to December 31, 2019 after which the Agreement became a month to month agreement. A true and accurate copy of the Amendment is attached hereto and incorporated herein as Plaintiff's Exhibit B.

21.     The Amendment altered the terms of compensation and permitted Klein one opportunity to terminate the Agreement on June 30, 2019, but otherwise incorporated and extended the initial terms of the Agreement.

22.     The Agreement and Amendment provided that ROH could terminate the contract at any time with thirty (30) days written notice. No provision was made for termination by Klein with the exception of the one-time opportunity on June 30, 2019. (*See*, Ex. A at ¶ 1 and ¶ 8 and Ex. B at ¶ 1.)

23.     The Agreement and Amendment contains a non-competition clause that barred Klein from performing services for any company other than ROH that is broadcast on television and from performing services for World Wrestling Entertainment ("WWE"), WWE's NXT, Impact Wrestling, Dragon Gate USA/EVOLVE, Lucha Underground, FloSports TV or any of the aforementioned companies' affiliates, successors, or assigns; or from performing services that conflicted "in any way with the full and complete performance of Performer's services hereunder, as determined by the Company in its sole discretion." (*See*, Ex. A at ¶ 2.)

24.     The Agreement and Amendment required ROH to provide Klein with travel accommodations, including transportation to and from shows and a double occupancy room for each night of the show. (*See*, Ex. A at ¶ 2.)

25.     The Agreement and Amendment disavowed any requirement to use Klein's services; however, ROH was required to compensate Klein regardless of whether or not she performed. (*See*, Ex. A at ¶ 2.1.)

26.     The Agreement and Amendment obligated Klein to consider, in good faith, other opportunities with other promoters presented to Klein by ROH, provided the terms were similar to the terms in the Agreement and Amendment. (*See*, Ex. A at ¶ 2.1.)

27.     During the time that Klein was performing services for ROH under the Agreement and Amendment, ROH directed and controlled every aspect of Klein's performance of the services including, but not limited to, the following:.

a) ROH required Klein to wear a specific wardrobe other than the wardrobe Klein developed for herself;

b) Klein and her opponent were required to have ROH approve the movements of their wrestling performance;

c) ROH determined the outcome of the wrestling match; and,

d) ROH required Klein to arrive at a particular time to perform services.

28.     Under the Agreement and Amendment, ROH retained the right to require Klein to participate in certain personal appearances and meet and greet autograph sessions. (*See*, Ex. A at ¶ 4.1.)  Specifically, Klein had no control over how Defendants used her professional wrestling images and likeness. On multiple occasions, Defendants used images and likenesses of Klein, to which she was neither asked for consent, nor would consent have been granted had Defendants sought consent from Klein. Moreover, Klein had no control over whether DVDs, pictures, action figures, or any other of her images or likeness were used, either commercially, or otherwise, nor did she have any control over the use of her images while employed by Defendants.

29.     Pursuant to the Agreement and Amendment, ROH was required to pay Klein royalties from merchandise sales, including but not limited to, t-shirts and "Best of" DVD's. These royalties were to equal 20% of the net profit and paid quarterly. (*See*, Ex. A at ¶ 4.2.)

30.     Pursuant to the Agreement and Amendment, ROH was required to pay Klein royalties from sales of any action figures created in her likeness. These royalties were to be equal to 25% of the net profit and paid quarterly. (*See*, Ex. A at ¶ 9(b.).)

31.     Pursuant to the Agreement and Amendment, ROH retained "the absolute and irrevocable right and permission" to require Klein to "maintain his [sic] availability for and shall render his [sic] performing services in connection with, the rehearsal, performance and broadcast on behalf of or arranged by the Company ('Performances')." (*See*, Ex. A at ¶ 9(a.)(iv).)

32.     Pursuant to the Agreement and Amendment, ROH retained "the absolute and irrevocable right and permission" to assign the rights granted under the contract without Klein's permission. (*See*, Ex. A at ¶ 9(a.)(v).)

33.     Pursuant to the Agreement and Amendment, Klein did not have any right to assign the contract. (*See*, Ex. A at ¶ 21.)

34.     Pursuant to the Agreement and Amendment, ROH retained the right to terminate the Agreement and Amendment for various reasons including the failure "to conduct or finish a performance in accordance with the Company's direction." (*See*, Ex. A at ¶ 15(vi).)

35.     Pursuant to the Agreement and Amendment, ROH retained the right to terminate the Agreement and Amendment for various reasons including jeopardizing "the FCC license of any broadcast station owned or programmed by Sinclair Broadcast Group, Inc." (*See*, Ex. A at ¶ 15(viii).)

36.     The Agreement and Amendment contained a Non-Competition clause whereby Klein was prohibited from providing any services to any other professional wrestling organization whether directly or through third-party intermediaries. ROH barred Klein from performing services for every other company in the United States where she could earn a decent living (restricting Klein from working for a wrestling company on television thereby restricts her ability to earn a living and survive since the only wrestling companies that can pay a living wage is a company with television clearance). Klein was prohibited from participating in any live or

taped appearances, promotions, or any form of media, whether or not related to wrestling, without the consent of ROH.  Further, if the Agreement and Amendment was terminated for a breach by Klein, she was prohibited from providing any services related to entertainment media or distribution. (*See*, Ex. A at ¶ 16.)

37.     The Agreement and Amendment prohibits Klein from acting as an agent for, a consultant to, or as an officer, employee, or other representative of ROH's competitors or prospective competitors without ROH's consent. (*See*, Ex. A at ¶ 25.)

38.     The Agreement and Amendment contains a purported waiver and indemnification for bodily injuries. (*See*, Ex. A at ¶ 19.)

39.     The Agreement and Amendment purportedly requires arbitration for claims arising out of or relating to the Agreement and Amendment. (*See*, Ex. A at ¶ 20, et seq.)

40.      The Agreement and Amendment provides that the arbitrators shall be bound by and strictly enforce the terms of the Agreement and may not limit, expand, or otherwise modify its terms. (*See*, Ex. A at ¶ 20.5.)

41.     In contrast, the Agreement and Amendment also provides that the arbitrators shall have the power and authority to award any remedy or judgment that could be awarded by a court of law in the State of Maryland under similar circumstances. (*See*, Ex. A at ¶ 20.8.)

42.     These two provisions conflict as one requires strict enforcement of the terms and prevents alteration of the terms while the other grants the arbitration the power to rescind or reform the Agreement and Amendment.

43.     By requiring strict enforcement of the terms of the Agreement and Amendment, Defendants have contractually pre-determined a favorable outcome for the Defendants in the event of an arbitration as the contract purported cannot be rescinded or reformed to reflect a

finding by the arbitrator that Klein was an employee rather than an independent contractor.

44.     Klein received payments under the Agreement and Amendment from Sinclair.

45.     Prior to becoming employed with Defendants, Klein worked as a professional wrestler with independent wrestling companies. These performances were singular in nature and did not involve any written contracts.

46.     Klein has no legal training and minimal experience with written contracts in the wrestling profession.

47.     At the time she became employed with Defendants in 2017, she was earning approximately $10,000 per year. This income was earned from independent wrestling and coaching softball. She was also a student at that time. Klein could not afford to expend funds to have an attorney review the contract drafted and presented by Defendants.

48.     In 2019, at the time she signed the "Amendment 2019," Klein was earning approximately $25,000 per year. This income was earned from Defendants in the amount of $20,000 and teaching pre-school in the amount of close to $5,000. Klein could not afford to expend funds to have an attorney review the contract drafted and presented by Defendants. Her approximate income in 2018 was $20,000.

49.     At the time of the filing of this Amended Complaint, Klein is employed at a pre-school teacher and earns approximately $21,000 per year. This was also the amount of her approximate income for 2020.

50.     Based upon information and belief, Klein, if successful, would be entitled to damages in an amount from the low to mid-six figures.

51.     Based upon information and belief, the cost of retaining one of the named arbitrators in the Agreement and Amendment, Edward Gutman, is $2,000 per eight-hour day.

52.     Further, based upon information and belief, any trial or hearing regarding Klein's claims will take approximately five to seven days.

53.     Thus, the cost of utilizing Mr. Gutman would be $10,000 to $12,000 for the resolution of Klein's claims. This is an additional cost that would not be incurred in trial. This amount is also approximately the same amount as Klein's compensation for the Agreement and approximately one-half or more of the amount of Klein's compensation under the Amendment.

54.     Based upon information and belief, Hilary Caplan, another named arbitrator has retired and is no longer providing arbitration services.

55.     Based upon information and belief, the costs of the three remaining arbitrators could not be determined as they are retired and public contact information is not available. Thus, Klein cannot provide any estimate of the costs associated with these arbitrators.

56.     The possibility exists that Klein may also be responsible for the not only the costs of the arbitration, but all of Defendants' attorney fees, expert witness fees, and costs should she not prevail in her claims.

57.     Defendants are represented by the firm of Fisher Phillips, which is a large firm with multiple offices throughout the United States. (*See*, https://www.fisherphillips.com/offices/, accessed June 7, 2021.) At the times Klein signed the Agreement and the Amendment, she would not have had any knowledge of the firm that would represent Defendants and could not determine the attorney fees that could be incurred.

58.     During the formation of the Agreement and the Amendment, Klein was able to negotiate her pay and the begrudging grant of a single date on which she was able to terminate the contract in the Amendment.

59.     At the times Klein signed the Agreement and Amendment, the opportunities to

work as a performer in the wrestling industry at a similar company was limited. These companies were limited to Impact Wrestling and New Japan Pro-Wrestling.

## **Injuries Suffered by Klein and Other Performers**

60.     As a result of Defendants' negligence and illegal actions, Klein and other wrestlers suffered many injuries while performing services for ROH.

61.     Although professional wrestling matches are predetermined, the action that occurs in the ring can lead to serious injury. As such, wrestling companies are supposed to maintain proper and adequate medical personnel on site and render proper medical care. ROH did not provide adequate medical supervision, evaluation, or care at wrestling matches for Klein and their other performers.

62.     On or about September 16, 2016, Klein had a wrestling match at the Stage AE venue in Pittsburgh, Pennsylvania and hit her head and neck on a steel guardrail during the match. Nobody employed or engaged by Defendants checked on Klein's condition and no medical staff was available to evaluate her. Immediately following the wrestling match, Klein reported her injury to Whitmer who was Defendants' agent in charge of the match, but no medical treatment was made available. Klein continued to suffer from headaches and pain from the impact of the guardrail through October 2016 so she told Johnston that she was going to seek treatment for the pain. Johnston did not offer any information, guidance or information regarding treatment.  Klein sought treatment at her own expense, was never reimbursed any of the costs by Defendants and Defendants never reached out to Klein about her injuries or the costs related thereto.

63.     On or about April 7, 2018 at the WHO Tournament in New Orleans, Klein was wrestling another female who kicked Klein in the head and pulled on Klein's head causing a

concussion. As a result of being disoriented from the concussion, Klein was unable to "kick out" (lift her legs off of the mat to raise her shoulders, which would signal the referee to stop counting the pin) thereby resulting in the wrong finish for the scripted ending of the match. Despite Defendants knowing that the finish of the match was botched, Defendants did not check on Klein. Klein reported the injury to Defendants' agent in charge of the match, Whitmer, but there were no medical personnel available to address her injury and no medical treatment was rendered. Klein never sought treatment for her concussion.

64.     On or about June 2, 2018, Klein's tooth was broken in a ROH match in the Hammerstein Ballroom at the Manhattan Center in New York City and, again, Klein reported the injury to Defendants' agent in charge of the match, Whitmer, but there were no medical personnel available to address her injury and no medical treatment was rendered. Klein sought medical treatment from a dentist for her injury and the tooth was capped. Despite ROH asking Klein for her x-rays and referencing her broken tooth both on their website and on an episode of their television show (episode 356, air date 7.13.2018), Defendants never followed up to check on Klein, request that she submit her medical bills or to reimburse her.  Per Klein's request, she was eventually reimbursed for the medical treatment related to the chipped tooth.

65.     On or about December 14, 2018, Klein had an in-person conversation with Ian Riccaboni, an announcer for ROH, advising him that many of the female wrestlers did not feel safe in the wrestling ring with women wrestlers who were reckless and not properly trained. Klein advised Riccaboni that ROH management did not take the safety of their performers seriously otherwise a lot of the female talent engaged by ROH would not be participating in matches. Riccaboni told Klein that he understood the concern but that Todd Sinclair, who was the main booker for female matches, really liked those reckless women wrestlers but that he

would have a talk with him about it (note that in professional wrestling, the "booker" is the person who sets up the wrestling matches, the storylines and the predetermined endings to the wrestling matches).

66.     On or about January 30, 2019, Klein had a conversation with Todd Sinclair in Baltimore, Maryland regarding Klein's safety concerns, specifically female talent being forced to work in matches they felt unsafe in and with people they did not feel safe with. Todd Sinclair told Klein that it was the first he had heard about these issues despite Klein previously overhearing another performer complaining to Mr. Sinclair about certain wrestlers being reckless and unsafe. Mr. Sinclair further explained that the unsafe, reckless women were only booked for a few more dates and asked that Klein work through those dates and that in the future Klein and others would be asked ahead of time if they agreed to work with those problematic performers. Klein had a similar conversation following a March 15, 2019 match in Las Vegas with Todd Sinclair, Johnston, and other ROH agents wherein she was also injured but the conversation fell on deaf ears.  Klein did not seek treatment for her injury in the match.

67.     On or about Saturday, April 6, 2019 at a sold-out ROH event at Madison Square Garden in New York City during her women's championship wrestling match, Klein was hurt as a result of a kick to the head. Klein attempted to protect herself by going outside the ring to the floor. Klein was outside the ring on the floor when the other female wrestler climbed to the top of the ring and dived on Klein.  Klein caught the other wrestler to prevent her from being injured, but Klein hit her head during the catch. Klein remembers telling someone who walked by her that she needed a minute to recover. Klein also attempted to let the referee know she was hurt, but she cannot remember how long she was dazed and/or unconscious.  Klein finished the match and was surprised that neither the referee nor any other representative of ROH was there to check

on her. Instead, Defendants permitted wrestlers to enter the ring and perform, including a wrestling move to Klein, despite Klein remaining injured in the ring. After the match, someone Klein did not recognize told her to go do an interview.

68.     On or about September 28, 2019, another female wrestler struck her head during a match. Klein sent a text message to Gilliand. He said it was a "judgment call" and that Gary (member of management) was on-site No management ever came to check on the injured wrestler who was being seen by EMT's.

69.     On or about October 12, 2019 in New Orleans, Klein discovered that her opponent was not up-to-date on her bloodwork, which is required for licensing in various states. Defendants are responsible for ensuring that all required bloodwork is completed.

70.     On or about October 26, 2019 in Newport, Wales, Klein was defending her title against Lana Austin.  During the match, Austin injured Klein's head, which left Klein confused and disoriented. She continued wrestling approximately six more minutes.  Klein believes she informed Marty Scurll she was injured, but she was talking incoherently and was unable to form sentences.  After the match, she was lying on the floor in the dressing room for an hour and after people heard her rambling incoherently for almost an hour, Mandy Leon (another wrestler) went to get help. Nobody from management ever came to check on Klein. EMT's arrived to check on her after one hour passed.

71.     On or about November 7, 2019, Klein met with Koff regarding, in part, safety issues surrounding the wrestling performances. Koff stated that a concussion protocol existed and that medical staff were always available. Klein advised him that medical staff was not always available nor were they identified to Klein or the other wrestlers. Klein further explained

that none of the wrestlers were aware of a concussion protocol or that medical staff was always available.

**DISCRIMINATION AND HARASSMENT**

72.     During the time that the Agreement and Amendment was in effect, Klein and all other female wrestlers were paid a lower wage than their comparable male counterparts.

73.     On or about January 13, 2017, while Klein was in a hot tub near the pool of a hotel where the wrestlers were staying the night before an event, Shipman approached Klein and, while leering at her in a way that made Klein uncomfortable, started harassing her by asking her questions about whether her boyfriend was there, if she was staying in the hotel alone and how long she would be at the hotel.  Shipman's behavior made Klein very uncomfortable.

74.     On or about January 25, 2017, Klein received an email from ROH management advising her and the other wrestlers that Shipman would be the new agent assigned to work with the female wrestlers. One day later, Klein responded to the e-mail and explained that she had witnessed and experienced several situations with Shipman that made her uncomfortable to work with him. She advised ROH management that she was not willing to work with Shipman and requested that another agent be assigned to her matches. Klein went on to explain that she had not expressed this sooner for fear of backlash or retaliation.

75.     In February of 2017, BJ Whitmer, another male wrestler signed to ROH, was informed by Shipman that Johnston informed Shipman that Klein had complained about him.

76.     In July of 2018, Sinclair, by and through their human resources department, spoke with Klein regarding another female wrestler's complaints regarding Shipman. Klein informed the department of her situation with Shipman in 2017 and was informed that no information had been received and no investigation was done. Klein also informed the department that Shipman

knew     she     accused     him     of     sexually     harassing     behavior.   (*See*, https://theringreport.com/indy_wrestling/taeler-hendrix-accuses-jay-lethal-of-derailing-her-career-in-ring-of-honor-a4328#gs.d07e44,last accessed June 8, 2021.)

77.    On or about November 3, 2018, a meeting between the female wrestlers and ROH management occurred. Todd Sinclair, Koff, Riccaboni, and Johnston were present. The discussion centered around the disparate treatment between the male and female talent of ROH despite the success of the female division of ROH. Specifically, the female talent discussed the lack of storylines; the way women were portrayed; the amount of television exposure, and why they were not being represented more in the marketing of the show. Management advised the female wrestlers that there was not enough time on the show so management was forced to think outside the box, producing YouTube content and social media marketing regarding the female talent.

78.    On or about December 17, 2018, Klein had email correspondence and a phone conversation with Gilliand regarding her salary. Specifically, after she saw the initial offer for $20,000.00 for 2019, she asked if it would be possible for her salary to be increased to $24,000.00. Gilliand rejected this because he stated that all female wrestlers in ROH were paid the same and that if he paid Klein more, then all of the other women wrestlers would have to be paid more. This salary was substantially below the salary that the male wrestlers were paid and the decision to pay the salary was based upon the fact that Klein was a female. Klein was asked to make more appearances, with no limit regarding the frequency of appearances, than the other female talent. Plaintiff learned that at least one male member of ROH talent was paid $184,000.00 and was afforded single-occupancy rooming.

79.     On or about January 30, 2019, Klein had a discussion with Sinclair regarding the lack of creativity in the female talent's storylines as compared to the male talent.

80.     On or about March 7, 2019, Klein was informed by Adam Birch that someone in management did not want her to go to training because Shipman would be there.

81.     On or about September 30, 2019, Klein had a discussion with Lauren Sisselman, a ROH employee who arranges travel, regarding Klein traveling to the dojo in Baltimore to train. Lauren said Gilliand had told her that if Shipman was going to be there, that Klein could not be there and instructed her to wait to confirm Shipman's presence before allowing Klein to come.

82.     On or about November 7, 2019, Klein met with Koff to discuss fair pay and sexual harassment. A human resources employee from Sinclair Broadcasting, Caitlin, was also present. Plaintiff advised Koff that the salaries for the female talent were not comparable to that of the male talent. Further, Klein complained about the sexual harassment by Shipman. Koff said he thought it had been resolved. Plaintiff told him it had not, but Plaintiff had just stopped talking about it because nothing had ever been done. Plaintiff had brought this up to HR in 2018 and that management had revealed her name to Shipman/Jay Lethal, even though there was no formal investigation, which created a hostile work environment for her. Koff stated that there was no documentation for the 2018 claim and that HR was only for employees and she was not an employee. When Klein asked for policies, Koff informed her that her contract was her "handbook."

83.     Plaintiff alleges that the Defendants terminated her contract as of December 31, 2019, because of her complaints regarding the disparate pay for WHO female wrestlers, the lack of safety and medical protocols after Plaintiff suffered the concussion in October of 2019, and the sexual harassment at ROH.

## FIRST CLAIM-DECLARATORY JUDGMENT
## VOIDING ARBITRATION AGREEMENT

84.     For her First Claim, Plaintiff Kelly Klein incorporates the allegations of all of the preceding paragraphs of this Amended Complaint as if fully restated herein.

85.     This Court has subject matter jurisdiction over this action for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure. An actual justiciable controversy between Klein and Defendants exists within the meaning of 28 U.S.C. § 2201 regarding whether the arbitration provisions are void or voidable due to duress, ambiguity, unconscionability and/or violation of Maryland public policy.

86.     Defendants presented the arbitration provisions to Klein in conjunction with the Agreement and Amendment. Defendants were in a far superior bargaining position as the opportunities available for professional female wrestlers are limited.

87.     Klein was presented the arbitration provisions by a large corporation with substantial legal resources at its disposal. These provisions were presented on a take it or leave it basis. Klein's unequal bargaining position is illustrated by the fact that the compensation in the Agreement was a paltry $12,000.00 (Twelve Thousand Dollars) per annum.

88.     As a result of the unequal bargaining power, limited opportunities, and take it or leave it basis for the offer, Klein was coerced into agreeing to the arbitration provisions and the provisions are void or voidable.

89.     The arbitration provisions do not set forth adequate rules regarding the initiation and conduct of any arbitration.

90.     The arbitration provisions fail to set forth the costs of arbitration. Based upon information and belief, Klein may incur an additional $10,000 to $12,000 for arbitration over the costs of litigation. If Klein is not the prevailing party, then she is liable for all of the arbitration

costs, and Sinclair and ROH's attorney fees and expenses. These amounts render arbitration cost prohibitive for Klein as she is unable to afford all of the costs incurred in arbitration.

91.     The arbitration provisions both require the arbitrators to strictly enforce the terms of the Agreement and Amendment and not modify the terms while, at the same time, granting the arbitrators the power and authority to award any remedy or judgment that could be awarded by a court of law in Maryland, which would include the power to modify the arbitration provisions and/or Agreement and Amendment. (See, Ex. A, ¶ 20.5 and ¶ 20.8).

92.     The arbitration provisions purport to apply to the determination of whether Klein is, in fact, an independent contractor or an employee and its terms purport to prohibit the determination that Klein is an employee as the arbitration provisions attempt to prohibit the modification of the contract.

93.     The State of Maryland has a strong public policy that employees be paid the wages they are due and a strong public policy to ensure that individuals are not misclassified as independent contractors when, in fact, they are employees.

94.     The arbitration agreement is one-sided in favor of Defendants as the arbitrator is required to find that Klein is an independent contractor and forecloses Klein's right to seek a declaration of her status as an employee and to recover the damages she would be entitled as a result of the misclassification.

95.     The arbitration provisions are unclear as to whether the Maryland Uniform Arbitration Act ("MUAA") applies.

96.     There exists an actual controversy of a justiciable issue between the Plaintiff and the Defendants within the jurisdiction of the Court involving the determination of whether the

arbitration provisions of the Agreement and Amendment are void or voidable, which controversy may be determined by a judgment of this Court.

97.     Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2201, Klein in good faith requests that the Court declare that Klein and Defendants are not required to arbitrate any matter arising out of the Agreement and Amendment on the basis that the arbitration provisions contained therein are void.

98.     In the alternative, Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, Klein in good faith requests that the Court declare that Klein and Defendants are not required to arbitrate any matter arising out of the Agreement and Amendment on the basis that the arbitration provisions contained therein are voidable.

## SECOND CLAIM-DECLARATORY JUDGMENT ESTABLISHING THAT PLAINTIFF IS AN EMPLOYEE OF DEFENDANTS

99.     For her Second Claim, Plaintiff Kelly Klein incorporates the allegations of all of the preceding paragraphs of this Amended Complaint as if fully restated herein.

100.    An actual justiciable controversy between Klein and Defendants exists within the meaning of 28 U.S.C. § 2201 regarding whether Plaintiff Klein is an employee of Defendants Sinclair and ROH and not an independent contractor.

101.    Sinclair and ROH retained the right to control every aspect of Klein's performance of services for Sinclair and ROH.

102.    Sinclair and ROH controlled Klein's costume for performance; the times for performance; the times she had to be available for other appearances, such as autograph signing; the script for the performance of the wrestling match; the outcome of the wrestling match; and, other entities for which she could perform.

103.    Sinclair and ROH had the right to terminate the relationship, but Klein was given only one date upon which she could terminate the relationship.

104.    Sinclair and ROH could terminate the relationship for cause and subject Klein to a six-month restrictive covenant.

105.    Termination for cause included failing "to conduct or finish a performance in accordance with the Company's direction." (See, Ex. A, ¶ 15(vi).)

106.    There exists an actual controversy of a justiciable issue between the Plaintiff and the Defendants within the jurisdiction of the Court involving the determination of whether Plaintiff is an employee of Defendants rather than an independent contractor, which controversy may be determined by a judgment of this Court.

107.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, Klein in good faith requests that the Court declare that during the entire time that Klein was performing services for ROH and Sinclair, Klein was an employee and not an independent contractor.

### THIRD CLAIM-DECLARATORY JUDGMENT ESTABLISHING THAT THE PROVISIONS OF THE AGREEMENT AND AMENDMENT RELATING TO KLEIN'S CLASSIFICATION AS AN INDEPENDENT CONTRACTOR ARE VOID AS AGAINST PUBLIC POLICY

108.    For her Third Claim, Plaintiff Kelly Klein incorporates the allegations of all of the preceding paragraphs of this Amended Complaint as if fully restated herein.

109.    An actual justiciable controversy between Klein and Defendants exists within the meaning of 28 U.S.C. § 2201 regarding whether all of the provisions of the Agreement and Amendment relating to Klein's classification as an independent contractor are void as against public policy.

110.    The State of Maryland espouses a strong public policy requiring that individuals performing services for another be properly classified as an employee or as an independent contractor.

111.    Section 8-205 of the Annotated Code of Maryland defines "independent contractor" for the purposes of unemployment insurance as follows:

(a)  In general. --Work that an individual performs under any contract of hire is not covered employment if the Secretary is satisfied that:

(1) the individual who performs the work is free from control and direction over its performance both in fact and under the contract;

(2) the individual customarily is engaged in an independent business or occupation of the same nature as that involved in the work; and,

(3)  the work is:

(i)  outside of the usual course of business of the person for whom the work is performed; or

(ii) performed outside of any place of business of the person for whom the work is performed.

112.    Similar factors are relevant in the area of workers compensation:

LE § 9-202(a) of the Annotated Code of Maryland sets forth a presumption that individuals are presumed to be a covered employee for purposes of workers compensation "while in the service of an employer under an express or implied contract of apprenticeship or hire." "To overcome the presumption of covered employment, an employer shall establish that the individual performing services is an independent contractor in accordance with the common law or is specifically exempted from covered employment under this subtitle." LE § 9-202(c).

*Injured Workers' Ins. Fund v. Orient Express Delivery Serv*., 190 Md. App. 438, 460, 988 A.2d 1120 (2010).

113.    The general trend in Maryland has been to narrowly define 'independent contractor' and to protect employee access to unemployment insurance, workers' compensation insurance, and other benefits." (See, Id.)

23

114.    "The Workplace Fraud Act, which became effective on October 1, 2009, makes it a violation to fail to properly classify workers as employees, and imposes penalties on those employers who knowingly misclassify their workers. LE § 9-402.1." (See, Id.)

115.    The "Recovery of Benefits and Penalties for Fraud Act," which became effective on October 1, 2016, imposes significant civil penalties for knowing misclassification of workers as independent contractors.

116.    Md. Code Ann., Lab. & Empl. § 3-405 renders an agreement to work for less than minimum wage void. Klein worked for less than minimum wage under the Agreement and Amendment.

117.    The Agreement and Amendment clearly misclassifies Klein as an independent contractor when she was, in fact, an employee. Sinclair and ROH retained the right to completely control every aspect of Klein's wrestling performance. Sinclair and ROH also retained the right to prohibit Klein from performing wrestling services for other entities without consent. Sinclair and ROH retained the right to terminate Klein's performance of wrestling for Sinclair and ROH, but denied Klein the right to terminate her provision of services. Sinclair and ROH retained the right to terminate the relationship for cause and imposed a restrictive covenant. Clearly, Klein and the other ROH and WOH wrestling superstars were employees of the Defendants and not independent contractors.

118.    The intent and import of the Agreement and Amendment was to make Klein an employee while misclassifying her as an independent contractor.

119.    The Agreement and Amendment are void as against the public policy requiring the correct classification of employees and independent contractors in the State of Maryland.

120.    There exists an actual controversy of a justiciable issue between the Plaintiff and the Defendants within the jurisdiction of the Court involving the determination of whether all of the provisions of the Agreement and Amendment relating to Klein's classification as an independent contractor are void as against public policy, which controversy may be determined by a judgment of this Court.

121.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, Klein in good faith requests that the Court declare that all of the provisions of the Agreement and Amendment relating to Klein's classification as an independent contractor are void as against public policy.

## FOURTH CLAIM-DECLARATORY JUDGMENT ESTABLISHING THAT DEFENDANTS ARE JOINTLY AND SEVERLLY LIABLE

122.    For her Fourth Claim, Plaintiff Kelly Klein incorporates the allegations of all of the preceding paragraphs of this Amended Complaint as if fully restated herein.

123.    An actual justiciable controversy between Klein and Defendants exists within the meaning of 28 U.S.C. § 2201 regarding whether Defendants Sinclair and ROH are entitled to the protections afforded separate corporate entities or whether they are not entitled to said protection and are jointly and severally liable for the harm to Plaintiff Kelly Klein.

124.    An actual justiciable controversy between Klein and Defendants exists within the meaning of 28 U.S.C. § 2201 regarding whether that Defendants Sinclair and ROH are entitled to the protections afforded separate corporate entities or whether they are not entitled to said protection and are jointly and severally liable for the harm to Plaintiff Kelly Klein.

125.    Sinclair, as parent company, is so closely related and integrated to ROH, the subsidiary, as to constitute a single integrated enterprise, and thus, they are jointly and severally liable for their wrongful acts.

126.    Sinclair and ROH misrepresented to Klein that she was an independent contractor rather than an employee, despite Sinclair and ROH retaining the right to control Klein's performance. Klein justifiably relied on these misrepresentations. As a result, Klein was denied the statutory benefits and protections afforded employees in Maryland and denied the benefits provided by Sinclair and ROH to their employees.

127.    There exists an actual controversy of a justiciable issue between the Plaintiff and the Defendants within the jurisdiction of the Court involving the determination of whether Sinclair and ROH are jointly and severally liable to Plaintiff, which controversy may be determined by a judgment of this Court.

128.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, Klein in good faith requests that the Court declare that Defendants Sinclair and ROH are not entitled to said protection and are jointly and severally liable for the harm to Plaintiff Kelly Klein.

## FIFTH CLAIM- DECLARATORY JUDGMENT AND CLAIM FOR DAMAGES ESTABLISHING ROYALTIES DUE

129.    For her Fifth Claim, Plaintiff Kelly Klein incorporates the allegations of all of the preceding paragraphs of this Amended Complaint as if fully restated herein.

130.     An actual justiciable controversy between Klein and Defendants exists within the meaning of 28 U.S.C. § 2201 regarding whether Defendants Sinclair and ROH have paid to Plaintiff Kelly Klein all of the amounts due for Royalties.

131.    Klein is entitled to royalties equal to 20% (Twenty Percent) of the net profits from the sales of t-shirts and "Best of" DVD's featuring her performances.

132.    Based upon information and belief, Klein alleges that she has not received all the royalties due to her from Sinclair and ROH.

133.    There exists an actual controversy of a justiciable issue between the Plaintiff and the Defendants within the jurisdiction of the Court involving the determination of whether Sinclair and ROH are required to pay Klein past due royalties, which controversy may be determined by a judgment of this Court.

134.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, Klein in good faith requests that the Court declare that Defendants Sinclair and ROH are required to pay Plaintiff Kelly Klein past due royalties.

## SIXTH CLAIM-BREACH OF IMPLIED CONTRACT (IN THE ALTERNATIVE)

135.    For her Sixth Claim, Plaintiff Kelly Klein incorporates the allegations of all of the preceding paragraphs of this Amended Complaint as if fully restated herein.

136.    If the provisions of the Agreement and Amendment regarding Klein's classification as an independent contractor are void, then an implied contract exists between Sinclair, ROH, and Klein requiring Sinclair and ROH to compensate Klein for the reasonable value of her services, which would not be less than the minimum wage per hour, and to compensate her for overtime. (See, Md. Code Ann., Lab. & Empl. § 3-413 and Md. Code Ann., Lab. & Empl. § 3-415.)

137.    Klein conferred benefits upon Sinclair and ROH, which they knew and appreciated.

138.    Sinclair and ROH's retention of the benefits provided by Klein without payment for those benefits would be inequitable.

## SEVENTH CLAIM-FAILURE TO PROVIDE A SAFE PLACE OF EMPLOYMENT

139.    For her Seventh Claim, Plaintiff Kelly Klein incorporates the allegations of all of the preceding paragraphs of this Amended Complaint as if fully restated herein.

140.    Sinclair and ROH have a statutory and common law duty to provide a safe place of employment for their employees, employees of other entities, and independent contractors.

141.    Sinclair and ROH breached their duties by failing to have a concussion protocol, failing to have medically trained personnel at wrestling matches, and failing to properly observe other requirements related to maintaining a place of employment.

142.    As a direct and proximate result of Sinclair and ROH's breach of duty, Klein suffered severe and permanent injuries, incurred medical expenses, suffered lost wages, and experienced pain, suffering, inconvenience, and other nonpecuniary damages.  Said damages are continuing in nature.

## EIGHTH CLAIM-VIOLATION OF STATE AND FEDERAL EQUAL PAY ACTS

143.    For her Eighth Claim, Plaintiff Kelly Klein incorporates the allegations of all of the preceding paragraphs of this Amended Complaint as if fully restated herein.

144.    Sinclair and ROH discriminated against Klein on the basis of her sex by paying her compensation that was less than were paid to male wrestlers despite the fact that the performance by male and female wrestler requires equal skill, effort, and responsibility, and are performed under similar working conditions.

145.    The disparity in the rate of pay violated federal and state statutes prohibiting discrimination in pay rates based upon sex. (*See,* 29 U.S.C. § 206(d) and Md. Code Ann. Lab. & Empl. § 3-304.)

146.    Sinclair and ROH terminated Klein's employment in violation of Md. Code Ann., Lab. & Empl. § 3-308.

147.    Klein seeks damages as set forth in Md. Code Ann. Lab. & Empl. § 3-307(a) and/or 29 U.S.C. § 206(d) to the extent that a duplication of damages does not occur.

28

## NINTH CLAIM-SEXUAL HARASSMENT (IN THE ALTERNATIVE)

148.     For her Ninth Claim, Plaintiff Kelly Klein incorporates the allegations of all of the preceding paragraphs of this Amended Complaint as if fully restated herein.

149.     Plaintiff asserts claims against Sinclair and ROH pursuant to Md. Code Ann. State Gov't. § 20-601, *et seq.* for discrimination on the basis of her sex, a hostile work environment, and retaliatory discharge.

150.     Sinclair and ROH are liable for their own discriminatory and harassing actions and the discriminatory and harassing actions of their supervisors and individuals who directed or evaluated Klein.

151.     As a direct and proximate result of Sinclair and ROH's breach of duty, Klein suffered severe and permanent injuries, incurred medical expenses, suffered lost wages, and experienced pain, suffering, inconvenience, and other nonpecuniary damages.  Said damages are continuing in nature and permanent.

## TENTH CLAIM-ABUSIVE DISCHARGE (IN THE ALTERNATIVE)

152.     For her Tenth Claim, Plaintiff Kelly Klein incorporates the allegations of all of the preceding paragraphs of this Amended Complaint as if fully restated herein.

153.     Sinclair and ROH discharged Klein. The bases for the discharge violated clear mandates of public policy.

154.     A nexus exists between Klein's actions and Sinclair and ROH's decision discharge her and to not renew her contract.

155.     Klein repeatedly expressed opinions to Sinclair, ROH, and others regarding the actions of Sinclair and ROH. These opinions that were expressed regarded the safety of the

professional wrestlers; the inequality in pay; and the sexual harassment occurring in the work environment.

156.    Sinclair and ROH had the right to terminate the Agreement and Amendment for any reason with thirty days notice.

157.    Sinclair and ROH were the promoters of the wrestling matches in which Klein performed.

158.    COMAR 19.14.08.06(B) requires that the promoter shall be responsible for conducting wrestling contests in a safe, peaceable, and orderly fashion.

159.    Sinclair and ROH failed to conduct the wrestling matches in a safe manner. Klein and other wrestlers suffered injuries from wrestling that were not recognized and not addressed. Sinclair and ROH permitted unsafe wrestling practices to occur and failed to respond to Klein's complaints regarding the unsafe practices.

160.    As a direct and proximate result of Klein's public comments regarding the lack of safety protocols at Sinclair and ROH wrestling events and other statements as described above, Sinclair and ROH terminated her contract despite on-going negotiations.

161.    Klein is entitled to compensatory damages directly resulting from the termination of her employment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Kelly Klein prays that this Court enter judgment in her favor on each and every count set forth above, and award it relief in an amount greater than $75,000, including, but not limited, the following:

(A) Declaratory judgment from this Court as set forth and requested herein;

(B) Compensatory damages including, but not limited to past and future medical bills, past and future lost wages, and lost earning capacity;

(C) Damages as set forth in Md. Code Ann. Lab. & Empl. § 3-307(a) and/or 29 U.S.C. § 206(d);

(D) Annoyance, aggravation, inconvenience, loss of enjoyment of life, emotional distress; mental anguish;

(E) Consequential and incidental damages;

(F) Court costs and expenses incurred in this action;

(G) Pre and post judgment interest;

(H) Attorneys' costs and fees;

(I)  All such damages and relief as are available under Maryland Code § 2-305, *et seq*. or other applicable Maryland law; and,

(J)  All such other and further relief as this Court deems just and proper.

Dated: June 10, 2021                              Respectfully submitted,

                                                 /s/Julian A. Haffner
                                                 _____
                                                 Julian A. Haffner
                                                 9841 Washingtonian Blvd., Suite 200
                                                 Gaithersburg, MD 20878
                                                 Telephone:  240.514.4150
                                                 Fax:  240-514-4155

                                                         and

                                                 /s/Stephen P. New
                                                 _____
                                                 Stephen P. New, pro hac vice
                                                 New, Taylor & Associates
                                                 P.O. Box 5516
                                                 Beckley, WV 25801
                                                 Telephone:  304.250.6017
                                                 Fax: 304.250.6012

                                                 Attorneys for Plaintiff

# EXHIBIT A

## INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement (the "Agreement"), is entered into on **20 December**, 2017 and effective as of January 1, 2018 (the "Effective Date") by and between **RING OF HONOR WRESTLING ENTERTAINMENT, LLC**, a Maryland limited liability company with its principle place of business located at 10706 Beaver Dam Road, Cockeysville, Maryland 21030 (the "Company"), and Kelly Klein (hereinafter referred to as "Performer"). The Performer shall be identified as follows:

Stage Name: Kelly Klein
Address: 12160 Regency Run Ct #8, Cincinnati, OH 45240
E-mail Address: RealKellyKlein@aol.com

## RECITALS

**WHEREAS**, the Company is engaged in the professional wrestling business, including, but not limited to, its live, remote, and/or DVD productions of professional wrestling programming content for viewing on television, cable, etc. and for distribution to third parties (the "Business"); and

**WHEREAS**, the Company wishes to hire the Performer to perform as a professional wrestler in furtherance of the Business during the term of this Agreement, and the Performer is willing to perform as a wrestler on the terms and conditions set forth by this Agreement; and

**WHEREAS**, Performer wishes to acknowledge his understanding that the performance of professional wrestling is an activity inherently dangerous and wishes to make certain waivers, releases of liability and assumptions of risk relating to the same as set forth in this Agreement; and

**WHEREAS**, the Company and Performer intend that an independent contractor relationship be created by this Agreement such that the Company is interested only in the results to be achieved by the Performer and the conduct and control of the work will lie solely with the Performer.

**NOW, THEREFORE**, in consideration of the engagement of the Performer by the Company, the compensation paid to the Performer, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Term**. This Agreement shall have a term of One Year beginning January 1, 2018 and ending December 31, 2018. Company shall have the right, in its sole discretion, to terminate this Agreement at any time during the term or during any extended term upon thirty (30) days written notice to Contractor. Company shall not have any further obligation to compensate you for any remaining services except for those services rendered prior to the effective date of termination. If Performer is found to be physically or mentally impaired to the extent that Performer is incapable of performing in in-ring wrestling events related to the services hereunder to Company's satisfaction (in the exercise of Company's sole, absolute and arbitrary discretion) for any period of time during the term of this Agreement (a "Performer Impairment"), then, at the sole discretion of Company, the Term of this Agreement shall be extended by a period of time necessary to enable Performer to perform in additional in-ring wrestling events equal to the number of such events missed by such Performer Impairment.

2. **Services**. The Company desires that the Performer provide, and the Performer agrees to provide, the following services: (i) wrestle, perform, and/or make personal appearances at shows and events organized and promoted by the Company or Company's agent; (ii) coordinate and provide

costumes, wardrobe, props, and make-up for the Performer's performances as a professional wrestler at events organized and promoted by the Company or Company's agent; and (iii) provide, create, broadcast, tape or display any media, including internet and social media (i.e. tweeting) as requested by Company. If Performer is not scheduled to perform services for Company, Performer may perform services for other promoters, provided, however, that (i) Performer may not perform services (including, but not limited to, performances, appearances, promotions or media events) if such services are to be shown via television, cable, pay-per-view, internet pay-per-view, video on demand, internet or any other means of broadcast, (ii) Performer may not perform services related to or in connection with World Wrestling Entertainment ("WWE"), WWE's NXT, Impact Wrestling, Dragon Gate USA/EVOLVE, Lucha Underground, FloSports TV or any of their affiliates, successors, or assigns and (iii) Performer may not perform services, performances or participate in any events that conflict in any way with the full and complete performance of Performer's services hereunder, as determined by Company in its sole discretion  The Company will provide the Performer with travel accommodations, which shall include transportation to and from shows and a double occupancy room for the night of each show in which the Performer is expected to provide services.

  **2.1** **Use of the Performer's Services**.  Nothing contained in this Agreement shall be deemed to obligate the Company to use the Performer's services for any particular performance.  The Company shall have fully discharged its obligations under this Agreement by paying the Performer the Compensation set forth herein. The Performer agrees to consider in good faith other opportunities which the Company may present to the Performer with other promoters; provided such terms are similar to the terms contained within this Agreement.

  **2.2** **Relationship of Parties**.  The Performer is engaged in an independent business and is an independent contractor.  The Performer shall under no circumstances be considered an employee of the Company, nor shall the Performer have any authority to hold himself out or represent (or take any action holding himself out or representing) that he is an employee of the Company.  The Company shall have no right to, and shall not exercise control over, the manner, mode, means, or methods which the Performer uses to perform the services required of the Performer hereunder.  The Performer and the Company agree that the Performer shall not be entitled to any benefits paid or provided under any employee benefit plan available to any of the Company's employees.

  **3.** **Compensation**.  During the Term, the Company agrees to pay the Performer for all services provided by the Performer the rate of Twelve Thousand Dollars ($12,000) per annum to be paid in monthly installments and prorated for partial months.

  **4.** **Personal Appearances and Royalties**.

  **4.1** **Personal Appearances**.  The Company may require the Performer to participate in certain personal appearances and meet and greet autograph sessions at dates and times surrounding a show in which the Performer will perform services.  The Performer shall receive fifty percent (50%) of the net profit from any such personal appearances and/or meet and greet autograph sessions solely attributable to Performer's personal appearance, which shall be determined as the cost less expenses, multiplied by 50% (e.g., $10 cost of autographed photo, less $2 for photo expenses = $8 x 50% = $4).

  **4.2** **Royalties**.  The Performer shall be paid royalties for t-shirts and "Best of" DVDs featuring the Performer in the amount of twenty percent (20%) of net profits from sales of such items, which payment shall be made quarterly.

  **5.** **Federal, State, and Local Payroll Taxes**.  The Company shall not withhold or pay federal, state, or local income taxes or payroll taxes of any kind on behalf of the Performer or any employees of the Performer.  Payment of all such taxes shall be the responsibility and obligation of the

Performer. The Company shall not treat the Performer as an employee with respect to the services performed hereunder for federal, state, or local tax purposes.

6. **Notice to Performer about Tax Duties and Liabilities**. The Performer understands that he or she is responsible to pay, according to law, the Performer's federal and state income taxes, and that the Company is not withholding or paying any portion of the Performer's taxes. The Performer further understands that the Performer may be liable for self-employment (Social Security) tax, to be paid by the Performer according to law. Performer agrees to complete and sign the attached Form W-9.

7. **Responsibility for Workers' Compensation**. No workers' compensation insurance shall be obtained by the Company covering the Performer or any employees of the Performer. The Performer shall comply with the workers' compensation law concerning the Performer and any employees of the Performer.

8. **Termination of Agreement**. This Agreement may be terminated at any time by the Company by providing thirty (30) days advance written notice to Performer. Notice shall be deemed to have been sufficiently given when delivered in accordance with Section 17 of this Agreement. In the event of termination of this Agreement, the Company shall not be liable for, nor shall the Performer be liable to perform, any services or expenses incurred after the effective date of such notice of termination. The Company shall not be liable for payment of any compensation to the Performer for any period following the effective date such of notice of termination.

9. **Release and Grant of Rights**.

   a. During the term of this agreement and thereafter in perpetuity, the Performer grants to the Company the absolute and irrevocable right and permission, with respect to the photographs, film, tape, or any form of media known or to be developed hereafter or use of any existing and/or future content technology utilizing his image or likeness that were created, produced and/or taken of him by or on behalf of the Company in conjunction with any Company production. In addition, the Performer grants to the Company the absolute and irrevocable right and permission to (i) copyright the same in the Company's own name or any other name that the Company may designate or assign; (ii) use and reuse the same, in whole or in part, individually or in conjunction with any other Company production used, produced, or created in any medium for any purpose whatsoever, including, but not limited to the use, production, distribution, and sale of such images of him in conjunction therewith; (iii) use his name in connection with any such use by or on behalf of the Company, in the Company's sole and absolute discretion; (iv) maintain his availability for and shall render his performing services in connection with, the rehearsal, performance and broadcast on behalf of or arranged by the Company ("Performances"); and (v) assign to any other person or entity the rights granted hereunder without the consent or permission of the Performer. The Performer does release and discharge the Company, its officers, shareholders, employees and/or agents, and any photographer, filmmaker, or content creator, their heirs, agents, employees, executives, assigns and any designees (including any agency, client, broadcaster, PR or other publication) from any and all claims and demands arising out of or in connection with the use of such images of the Performer, including but not limited to, any claims for defamation or invasion of privacy resulting from the Performer's appearance in any Company production. Further, the Performer agrees to defend, indemnify, and hold harmless the Company and its officers, shareholders, employees, and their agents from any claims, suits, or liability from any nature caused by or arising out of the Performer's participation or performance in such Company productions.

b. Performer hereby grants, and confirms previous grants to Company, that, during the term of the Independent Contractor Agreement and thereafter in perpetuity, Company has the absolute and irrevocable right and permission to manufacture, distribute, promote, advertise and sell any toy, trading card or any other product ("Products"), including the right to use any photographs, film, tape or any other form of media to create Products bearing the image or likeness of Performer. In addition, Performer grants to the Company, and confirms previous grants to the Company, the absolute and irrevocable right and permission to (i) copyright the same in Company's own name or any other name that Company may designate or assign; (ii) use, reuse, manufacture, distribute, promote, advertise and sell the same, in whole or in part, individually or in conjunction with any other Company production used, produced, or created in any medium for any purpose whatsoever, including, but not limited to the use, production, distribution, and sale of such Products in conjunction therewith; (iii) use Performer's name in connection with any such use by or on behalf of Company, in the Company's sole and absolute discretion; and (iv) assign to any other person or entity the rights described hereunder without the consent or permission of Performer. During the term of the Independent Contractor Agreement, Performer shall be paid royalties for any action figures created in Performer's likeness and bearing Performer's name in the amount of twenty-five percent (25%) of Company's net profits from sales of such action figures, which payment shall be made quarterly. The calculation of Company's net profits from sales of action figures shall be determined by the Company in its sole discretion.

10. **Music Rights**. Performer hereby grants Company the worldwide and perpetual right and authority to use, publish, and reproduce any audio, written music, written lyrics, and recorded song (collectively, the "Music") which Performer may provide to Company, for Company's use in any and all media, now known or unknown. Performer represents and warrants that (i) Performer has the right to grant such Music rights to Company, and (ii) the Company's use of the Music will not violate the rights of any third parties. The Performer releases and discharges the Company, its officers, shareholders, employees and/or agents, and any photographer, filmmaker, or content creator, their heirs, agents, employees, executives, assigns and any designees, from any and all claims and demands arising out of or in connection with the use of such Music in any Company production. Further, the Performer agrees to defend, indemnify, and hold harmless the Company and its officers, shareholders, employees, and their agents from any claims, suits, or liability of any nature caused by or arising out of the breach of Performer's representations and warranties relating to the Music.

11. **Broadcast Rights**. The programs on which the Performer provides services and the Performer's performances on such programs may be broadcast, produced or otherwise transmitted or disseminated by the Company during this Agreement, and at any time thereafter, in whole or in part, without additional Compensation to the Performer. Any of the programs on which the Performer appears may, at the sole discretion and expense of the Company, be recorded and used for promotion, public service performances, sales, reference, files, syndication, or any other similar or like purpose. The sound element of any program may be deleted, modified or substituted in connection with any translation rights of the Company or otherwise in the use of any recording hereunder anywhere in the world.

12. **Assignment of Broadcast Rights**. The Performer hereby assigns and conveys to the Company any and all proprietary rights in or to any material furnished by the Performer to the Company under this Agreement, including without limitation Music rights described in Section 10. The Performer shall not have any right, title, or interest in any material embodied in any of the programs in which the Performer appears, regardless of any contributions which were made by the Performer to said programs. The Company shall have the right to destroy any of the aforementioned programs or materials or to sell lease, give, or transfer same to any person, corporation, partnership or entity.

**13.     Exploitation of Broadcast Rights**.  The Company shall retain the right to sell, syndicate, or license for broadcast or other transmission or dissemination programs in which the Performer appears or the Performer's voice, sobriquet, biography, recorded performance, picture, portrait, brief caricature, or likeness is used.  The Company may license said programs for broadcast or other transmission or dissemination without additional compensation to the Performer.

**14.     Representations and Warranties of the Performer**.  The Performer represents and warrants to the Company that he is free to enter into this agreement and to grant to the Company the rights granted herein; that his entering into this Agreement does not violate or infringe upon the any other agreement he has entered into nor the rights of others;  that no consent of any other person or entity is required for the Performer to enter into this Agreement and that he is not bound by any conflicting obligations which will prevent or interfere with his full performance of the terms of this Agreement. The Performer further agrees to indemnify and hold harmless the Company, its officers, directors shareholders, agents, its successors and assigns from any and all claims, actions, liabilities, damages, judgments, costs and fees, including reasonable attorney's fees arising out of any breach or alleged breach by the Performer of any representation or warranty or any other obligation set for the in this Agreement or any amendment or addendum thereof.

**15.     Breach**.  The Company shall have the right to terminate this Agreement, its obligation to make any payments hereunder, and Performer's services hereunder in the event the Performer (i) is under the influence of, uses, possesses or traffics any illegal drugs; (ii) is late or absent on more than two (2) occasions; (iii) is found to be physically or mentally impaired to the extent that the Performer is incapable of performing services hereunder to the Company's satisfaction (in the exercise of its sole, absolute and arbitrary discretion); (iv) is charged or found guilty of *any* felony or found guilty of any misdemeanor involving moral turpitude; (v) publicly denigrates the Company, its parent, affiliates, their officers, directors, employees, licensees, assigns or the Performer's participation in any program; (vi) fails to conduct or finish a performance in accordance with the Company's direction, (vii) commits any act which (in the exercise of the Company's sole, absolute and arbitrary discretion) negatively or adversely affects the reputation or performance of the Company, its parent, affiliates, licensees, or assigns or the value or integrity of the Company's programs, videos, or merchandise; and/or (viii) jeopardizes the FCC license of any broadcast station owned or programmed by Sinclair Broadcast Group, Inc.  In the event of termination of this Agreement due to the Performer's breach, the Company shall have no further obligation to the Performer hereunder subject only to the Company's obligation to pay any Compensation for services fully performed prior to the effective date of termination (specifically subject to offset for any damages incurred or alleged to have been incurred by the Company as the result or consequence of such breach).

**16.     Non-Competition**.  As material consideration for the Company entering this Agreement, except as permitted by Section 2 of this Agreement, the Performer agrees that (i) during the term of this Agreement, Performer shall not provide any services to any other professional wrestling organization (e.g., WWE, TNA, MTV), or third party intermediaries on behalf of any such wrestling organization, including promoters, whether directly or indirectly through such intermediary, including, but not limited to, performance in any live or staged wrestling events, promotions, advertising etc. to be utilized for television, cable, pay-per-view, internet pay-per-view, video on demand, internet or any other means of broadcast use or any other public appearances related to the same, (ii) during the term of this Agreement, Performer shall not participate in any live or taped appearances, promotions or any form of media, including but not limited to photographs, print, radio, television, cable, pay-per-view, internet pay-per-view, video on demand, internet or any other means of broadcast use (whether or not related to wrestling) without the prior written consent of the Company, and (iii) for a period of six (6) months from the date of termination of this Agreement due to the Performer's breach of the Agreement, Performer shall not provide any services to any print, radio, television, cable, pay-per-view, internet pay-per-view, video on demand, internet or any other means of entertainment media or distribution. The Performer agrees that because of the special, unique, and extraordinary nature of the obligations of the Company and the

Performer, which are the subject matter of this Agreement, the Performer's breach of this Agreement shall cause the Company irreparable injury which cannot be adequately measured by monetary relief. Accordingly, the Company shall also be entitled to injunctive and other equitable relief against the Performer to prevent any breach or default by the Performer hereunder without the necessity of proof of actual damages and such injunction or equitable relief shall be without prejudice to any other rights, remedies, or damages which the Performer may be legally entitled to seek.

      **17.**    **Notices**.  Unless written notice of change of address is given by one party to the other party, any notices to either party (and any and all statements, royalties or other payments which may become due to the Performer) shall be mailed to the addresses set forth for such party on the first page of this Agreement ,.  All notices (excluding statements and/or payments) shall be sent by Certified Mail, return receipt requested, courier, or overnight mail with notice of receipt, postage pre-paid, and shall be deemed sent on the date of mailing or delivery by courier.

      **18.**    **Confidentiality**.  Other than as may be required by applicable law, government order, or regulations, or by order or decree of a court of law, all information contained in this Agreement and obtained by the Performer in performing services hereunder shall be held strictly confidential and shall not be divulged by the Performer to any person or entity whatsoever at any time during the Term or after the termination of this Agreement without the Company's express prior written permission.  Violation of this <u>Section</u> 18 during the Term of this Agreement will be considered a breach of this Agreement.

      **19.**    **Waiver and Release of Liability, Assumption of Risk, and Indemnity Agreement.** **By signing this Agreement and in consideration of the opportunities provided to the Performer by the Company to engage in professional wrestling and payment received for performing in the art of professional wrestling, the Performer hereby acknowledges his understanding that the performance of professional wrestling is an activity inherently dangerous which is subject to a high degree of risk of serious bodily injury and/or death, as well as property damage and states as follows:**

      **I HEREBY WAIVE, DISCHARGE, AND RELEASE ANY AND ALL CLAIMS I HAVE, MAY HAVE, OR THAT I MAY EVER HAVE IN THE FUTURE AGAINST THE COMPANY, ITS PARENT, AFFILIATES, AGENTS, OFFICERS, EMPLOYEES, DIRECTORS INSURERS, AND ANY AND ALL LICENSEES, ASSIGNEES AND AUTHORIZED THIRD PARTIES REPRODUCING, BROADCASTING OR OTHERWISE USING OR EXPLOITING THE COMPANY'S MERCHANDISE, PROGRAM(S), OR RECORDINGS (COLLECTIVELY, THE "RELEASED PARTIES") AND ALL OF THEIR HEIRS, SUCCESSORS AND ASSIGNS THAT MAY ARISE FROM OR RELATE IN ANY WAY TO MY PARTICIPATION IN THE ACTIVITY OF PROFESSIONAL WRESTLING OR IN ANY RELATED ACTIVITIES, WHETHER CAUSED BY NEGLIGENCE OR OTHERWISE.  IN THIS REGARD, I ALSO AGREE ON MY OWN BEHALF, AS WELL AS ON BEHALF OF MY PERSONAL REPRESENTATIVES, MY ASSIGNS, MY HEIRS, AND MY NEXT OF KIN THAT I WILL NOT FILE SUIT OR ASSERT ANY DEMANDS OR CLAIMS FOR LIABILITY OR DAMAGES FOR ANY AND ALL LOSSES, INJURIES, OR DAMAGES OF ANY KIND ARISING OUT OF MY PARTICIPATION IN THE ACTIVITY OF PROFESSIONAL WRESTLING OR RELATED ACTIVITIES, WHETHER CAUSED BY NEGLIGENCE OR OTHERWISE.**

      **I HEREBY ASSUME FULL RESPONSIBILITY FOR ANY AND ALL RISK OF PERSONAL OR BODILY INJURY, DEATH, OR PROPERTY DAMAGE, NOW AND FOREVER, ARISING OUT OF OR RELATED TO PARTICIPATION IN THE ACTIVITY OF PROFESSIONAL WRESTLING, WHETHER FORESEEN OR UNFORESEEN AND WHETHER CAUSED BY NEGLIGENCE OR OTHERWISE.  I HEREBY SEPARATELY AGREE TO DEFEND, INDEMNIFY, AND SAVE AND HOLD HARMLESS THE RELEASED PARTIES AND ALL OF THEIR HEIRS, SUCCESSORS, AND ASSIGNS FROM ANY AND ALL LOSS, LIABILITY, DAMAGE, FEES, EXPENSES, OR COSTS THAT THEY MAY INCUR, NOW AND**

FOREVER, IN CONNECTION WITH ANY PERSONAL OR BODILY INJURY TO ME, MY DEATH, OR DAMAGE TO MY PROPERTY THAT ARISES OUT OF OR MAY BE ATTRIBUTABLE IN ANY MANNER TO MY PARTICIPATION IN THE ACTIVITY OF PROFESSIONAL WRESTLING.

I HEREBY ACKNOWLEDGE THAT THIS WAIVER AND RELEASE OF LIABILITY, ASSUMPTION OF RISK, AND INDEMNITY AGREEMENT EXTENDS TO ALL ACTS OF NEGLIGENCE, INCLUDING NEGLIGENCE IN PROVIDING ASSISTANCE, AND IS INTENDED TO BE AS BROAD AND INCLUSIVE AS PERMITTED BY LAW.  IF ANY PORTION HEREOF IS HELD INVALID, IT IS AGREED THAT THE BALANCE HEREOF SHALL, NOTWITHSTANDING, CONTINUE IN FULL LEGAL FORCE AND EFFECT.

I have read this Waiver and Release of Liability, Assumption of Risk, and Indemnity Agreement and fully understand that I have given up substantial rights by signing below.  I am aware of its legal effect and consequences, and I have signed it freely and voluntarily without any inducement, assurance, or guarantee being made to me, and I intend my signature to be my complete and unconditional release of all liability to the greatest extent that is allowed by law.  This Waiver and Release of Liability, Assumption of Risk, and Indemnity Agreement shall be binding upon and shall inure to the benefit of the Company, and its heirs, successors, agents, and assigns.

   20.   **Arbitration Required**.  Any controversy or claim arising out of or relating to this Agreement shall be settled by arbitration in accordance with the following provisions:

      20.1   **Disputes Covered**.  The agreement of the parties to arbitrate covers all disputes of every kind relating to or arising out of this Agreement, the performance of the Services, and/or the relationship between the Company and the Performer.  Disputes include actions for breach of contract with respect to this Agreement, as well as any claim based upon tort or any other causes of action relating to this Agreement, and claims based upon a federal or state statute.  The decision of the arbitrator shall be final and binding on the parties.

      20.2   **Location**.  The location for the arbitration shall be Baltimore County, Maryland. With respect to any action brought or litigation initiated in any way connected with the arbitration clause, either pre-arbitration, during arbitration, or after arbitration, exclusive jurisdiction and venue shall reside with the Circuit Court of Maryland for Baltimore County.

      20.3   **Law**.  The governing law for the arbitration shall be the law of the State of Maryland, without reference to its conflicts of laws provisions.

      20.4   **Selection of Arbitrator**.  Arbitration shall be conducted by one arbitrator selected from among the following individuals: Hilary Caplan, Joseph H. H. Kaplan, Norris Byrnes, Stanley Mazaroff, and Edward Gutman.  If the Company and the Performer are unable to agree from among the individuals herein named, then they shall alternately strike names from this list, with the Performer taking the first strike.  After each has struck two names, the remaining name shall be the arbitrator.  If the parties are unable to select an Arbitrator pursuant to this process due, for instance, to a conflict of interest on the part of the panel of arbitrators, selection shall be made pursuant to the Maryland Uniform Arbitration Act, with the restriction that the individual selected by the court must be a retired judge.

      20.5   **Substantive Law**.  The arbitrators shall be bound by and shall strictly enforce the terms of this Agreement and may not limit, expand, or otherwise modify its terms.  The arbitrators shall be bound to honor claims of privilege or work-product doctrine recognized at law.

      20.6   **Decision**.  The arbitrator's decision shall provide in writing a reasoned basis for

the resolution of each dispute and for any award, as well as the finding and award.

**20.7    Payment of Costs, Fees, and Expenses.** The arbitrator shall award to the prevailing party the fees, costs, and expenses of the arbitration, including the prevailing parties' reasonable attorneys' fees and expert witness fees, and the fees and expenses of the arbitrator; the reasonableness of such fees, costs, and expenses to be determined by the arbitrator. In the event a party prevails only in part, or the parties each prevail in part, the arbitrator may apportion reasonable fees and expenses among the parties as the arbitrator deems fair and just.

**20.8    Remedies; Award.** The arbitrators shall have power and authority to award any remedy or judgment that could be awarded by a court of law in the State of Maryland under similar circumstances. The award rendered by arbitration shall be final and binding upon the parties, and judgment upon the award shall be entered in the Circuit Court of Maryland for Baltimore County. The parties hereto consent to entry and enforcement of that judgment in any court of competent jurisdiction in the United States.

**21.    Assignment.** This Agreement shall be binding upon the parties hereto, their respective heirs, personal representatives, executors, administrators, successors, and permitted assigns. The Company may in its absolute and complete discretion assign this Agreement (and any of its rights, duties, responsibilities, covenants, representations, or warranties under this Agreement) to any successor. The Performer has no right to assign this Agreement (or any of his rights, duties, responsibilities, covenants, representations, or warranties under this Agreement) to any other party, and any attempted assignment by the Performer shall be void.

**22.    Governing Law.** This Agreement is made in Baltimore, Maryland and shall be governed, interpreted, and construed according to the laws of the State of Maryland. In addition, any disputes arising under this Agreement shall be governed by and determined in accordance with Maryland law.

**23.    Entire Agreement and Modification.** This Agreement sets forth the entire agreement of the parties concerning the engagement of Performer by the Company. This Agreement amends, supersedes, and replaces all prior agreements and understandings (including without limitation, the Original Agreement, which is hereby terminated), written or verbal, formal or informal, among the parties with respect to the hiring of the Performer by the Company, including the subject matter of this Agreement. The Performer expressly represents, warrants, and admits that, in agreeing to the terms hereof, he or she has not relied on any representation from any source other than those contained in this Agreement itself. Only a written instrument duly executed by each party hereto may modify this Agreement.

**24.    Costs of Enforcement.** In the event that either party institutes an action to enforce or interpret any provision of this Agreement, the non-prevailing party shall pay to the prevailing party all costs and expenses incurred (including a reasonable sum for attorneys' fees and all expert witness fees) incurred by the prevailing party in connection with any such action.

**25.    Conflicts of Interest.** The Performer shall not act as an agent for, consultant to, or as an officer, employee, or other representative for any of the Company's competitors or prospective competitors, without giving prior written notification to the Company and the consent of the Company, which consent may be withheld by the Company in its sole discretion. The Performer hereby warrants that there is no conflict of interest between the Performer's other employment, if any, or other contracts, if any, and the activities to be performed hereunder. The Performer shall advise the Company if a conflict of interest arises in the future.

**26.    Inventions, Patents, Trademarks.** The terms "work," "trademark," and "invention" include anything created for the Company by the Performer, whether alone or with others, and whether

those others be independent contractors, employees, or agents of the Company.

**26.1**    The term "work" includes, but is not limited to, any and all audio or visual DVDs, recordings of any kind, MP3s, books, writings, designs, models, drawings, photographs, physical property, reports, etc., that are protectable under Title 17 of the U.S. Code.

**26.2**    The term "trademark" means any name, word, phrase, logo, design, or other graphic depiction generated during the performance of this Agreement that is or can be used to describe either a product or service of the Company.

**26.3**    The term "invention" means any designs, processes, inventions, or discoveries that may be patentable or otherwise protectable under Title 35 of the U.S. Code.

**27.**    **Work Made for Hire**.  During the performance of this agreement, the Performer may create certain works for Company that may be copyrighted under the laws of the United States.  To the extent that any such works are created, the Performer will be considered to have created a work made for hire as defined in 17 U.S.C. § 101, and the Company shall have the sole right to the copyright.  If any work created by the Performer does not qualify as a work for hire, the Performer agrees to assign his or her right in the work to Company, as provided below.

**27.1**    **Title to Works, Trademarks, and Inventions Produced**.  It is understood and agreed that the entire right, title, and interest throughout the world to all works, trademarks, and/or inventions that are conceived of, prepared, procured, generated, or produced, whether or not reduced to practice, by the Performer, either solely or jointly with others during the course of, in connection with, or as related to the performance of this Agreement, shall be and hereby are vested and assigned by the Performer to the Company.  The Performer agrees to execute any and all documents prepared by the Company and to do all other lawful acts as may be required by the Company to establish, document, and protect such rights.  The Performer has acquired or shall acquire from each of his or her employees, consultants, and subcontractors, if any, the necessary rights to all such works, trademarks, and inventions produced by such employees, consultants, and subcontractors, within the scope of their employment by the Performer in performing services under this Agreement.  The Performer shall obtain the cooperation of each such employee to secure to the Company or its nominees the rights the Company may acquire in accordance with the provisions of this clause.

**28.**    **Counterparts**.  This Agreement may be executed in multiple counterparts or in duplicate, and when so executed by the Company and the Performer shall constitute one agreement.

**29.**    **Independent Legal Counsel**.  The Performer acknowledges that this Agreement was prepared by counsel for the Company.  The undersigned understand that the Performer and the Company may be adverse to each other regarding terms and conditions set forth in this Agreement.  The Performer acknowledges that counsel to the Company has not represented the Performer in connection with the preparation of this Agreement nor provided the Performer with any legal or other advice in connection with this Agreement and that the Performer has been advised and urged to seek independent professional legal, tax, and financial advice in connection with deciding to enter into this Agreement.

**30.**    **Severability**.  If any one or more of the provisions contained in this Agreement shall be invalid, illegal, or unenforceable in any respect under applicable law, the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be ineffective or impaired thereby.

**31.**    **Headings**.  The headings in this Agreement are for convenience of reference only and shall be given no effect in the construction or interpretation of this Agreement.

32.   **No Authority to Bind Company**.  The Performer has no authority to enter into contracts on behalf of or bind the Company.  This Agreement does not create a partnership between the parties.

33.   **Representations to Others**.  Neither the Performer nor the Company shall represent to others that the relationship between them is other than that stated in this Agreement.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the day and year first above written.

Ring of Honor Wrestling Entertainment, LLC:         Performer:

By: _____

Name:  David R. Bochenek                              Kelly Klein    Dec. 20, 2017
Title:  Authorized Signer                             Kelly Klein

# EXHIBIT B

## AMENDMENT 2019

This AMENDMENT is dated and effective as of January 1, 2019 by and between Ring of Honor Wrestling Entertainment, LLC ("Company") and Kelly Klein ("Performer") to the Independent Contractor Agreement effective January 1, 2018.

WHEREAS, the original term of the Agreement expired on December 31, 2018, and

WHEREAS, subject to the terms of the Agreement, it is the intent of the parties hereto to extend and amend the Agreement in accordance with the terms hereof.

NOW, THEREFORE, in consideration of the mutual covenants and promises herein contained, the parties hereto agree as follows:

1.      Section 1 of the Agreement is hereby amended by deleting the reference to "December 31, 2018" and replacing such reference with "December 31, 2019." The Term of this Agreement is extended per this Amendment from January 1, 2019 until December 31, 2019. At the expiration of the Term, this Agreement shall convert to a month to month Agreement until such time as either party provides thirty (30) day written notice to terminate. Performer shall have one (1) opportunity to freely terminate this agreement on June 30th, 2019 by providing thirty (30) days written notice to the Company.

2.      Section 3 of the Agreement is hereby deleted and replaced with the following:

> **Compensation**. During the Term, the Company agrees to pay the Performer for all services provided by the Performer the rate of Twenty Thousand Dollars ($20,000) per annum to be paid in monthly installments and prorated for partial months.

3.      Except as expressly provided herein, the Agreement shall not be amended or modified by this Amendment and each of the terms thereof shall continue in full force and effect.

[Signatures on following page]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

Company:                                    Performer:
Ring of Honor Wrestling
Entertainment, LLC                          _____
                                            Kelly Klein
By: _____
Name:  David R. Bochenek
Title:  Authorized Signer